IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

    v.                                                                                 Criminal No. 3:12cr044 (DJN)

DAVID ISAAC SOLOMON,
        Petitioner.

## MEMORANDUM OPINION

On March 20, 2012, a grand jury returned an indictment against Petitioner David Isaac Solomon, also known as David Chityal ("Petitioner"), charging him with one count of conspiracy to commit mail and wire fraud, one count of conspiracy to commit money laundering, one count of obstructing a pending proceeding and two counts of making false statements. On November 30, 2015, pursuant to a plea agreement, Petitioner pled guilty to conspiracy to commit mail and wire fraud. Subsequently, on February 8, 2016, Senior United States District Judge Robert E. Payne sentenced Petitioner to sixty months' imprisonment with three years of supervised release and a $100 special assessment, dismissing the remaining counts in the Indictment upon motion of the Government. This matter comes before the Court on Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody ("§ 2255 Motion") (ECF No. 93), seeking to vacate his sentence for ineffective assistance of counsel. For the reasons set forth below, the Court DENIES Petitioner's § 2255 Motion (ECF No. 93).

# I. BACKGROUND

When resolving a § 2255 motion without an evidentiary hearing, the Court must view the facts in the light most favorable to Petitioner. *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). With this principle in mind, the Court accepts the following facts.

## A. Underlying Conduct

On November 30, 2015, as part of his plea agreement, Petitioner stipulated to the following facts. (Statement of Facts ("SOF") (ECF No. 36).) At the time of his indictment, Petitioner was a citizen of Canada and a resident of Hungary. (SOF ¶ 3.) From October 7, 2009 until March 8, 2010, the Government imprisoned Petitioner at the Federal Correctional Complex in Beaumont, Texas ("FCC Beaumont"). (SOF ¶ 4.)

While incarcerated, Petitioner met "Conspirator 1," a fellow inmate. (SOF ¶¶ 5, 18.) Conspirator 1 was serving a 100-year sentence for his role in a $126 million fraudulent scheme using qualified intermediary companies. (SOF ¶¶ 6-8.) As part of his sentence, Conspirator 1's sentencing judge ordered him to pay $128,892,575.97 in restitution to the victims of the fraudulent scheme. (SOF ¶ 8.) To pay back this court-ordered restitution, in October 2007, Conspirator 1 agreed to convey certain assets to the bankruptcy estate of the intermediary companies that he had used as part of the fraudulent scheme (the "Bankruptcy Estate"), including any federal, state or local income tax refunds owed to him. (SOF ¶¶ 10-12.) To effectuate this conveyance, Conspirator 1 granted the power of attorney to the Bankruptcy Estate's accountant and trustee to receive Conspirator 1's tax information and file tax returns on his behalf. (SOF ¶ 13.) In October 2008, the Bankruptcy Estate's accountant filed amended tax returns for 2004 and 2005 on Conspirator 1's behalf, with an anticipated combined refund of over $2,000,000. (SOF ¶ 13.)

In July 2009, Conspirator 1 met with "Attorney A" regarding Attorney A's representation of Conspirator 1 in his criminal appeal. (SOF ¶ 14.) During this meeting, Attorney A informed Conspirator 1 that he would charge $500,000 for his services. (SOF ¶ 14.) Conspirator 1 told Attorney A that he expected large tax refunds and, on December 19, 2009, Conspirator 1 signed a new power of attorney form with the Internal Revenue Service ("IRS") naming Attorney A as his representative in lieu of the Bankruptcy Estate accountant. (SOF ¶¶ 15-16.) On May 19, 2010, Attorney A sent the IRS two forms executed by Conspirator 1 that authorized Attorney A to receive the anticipated refund checks. (SOF ¶ 16.) On July 30, 2010, Conspirator 1 revoked an additional power of attorney that he had granted to the trustee of the Bankruptcy Estate. (SOF ¶ 16.)

On March 8, 2010, Petitioner finished his sentence at FCC Beaumont and the Government moved him to a separate facility pending his deportation to Canada on June 10, 2010. (SOF ¶ 19.) Following Petitioner's deportation, Conspirator 1 spoke with Petitioner by telephone about his criminal appeal and retention of Attorney A, informing Petitioner that he had revoked the power of attorney granted to the Bankruptcy Estate in favor of Attorney A. (SOF ¶¶ 21-25.) During some of these calls, Petitioner and Conspirator 1 discussed how to prevent the Government from seizing the tax refunds and devised a plan to use the refunds as collateral for a loan that they would use to pay Attorney A's retainer, thereby distancing themselves from the refunds. (SOF ¶¶ 24-25.) Both Petitioner and Conspirator 1 communicated with Attorney A by telephone, U.S. mail and electronic mail to inquire about the status of the refund checks. (SOF ¶¶ 26-27.)

On June 17, 2010, Petitioner informed Conspirator 1 that he had contacted "Attorney B," a Canadian lawyer. (SOF ¶ 28.) Pursuant to Petitioner's agreement with Attorney B,

Conspirator 1 instructed Attorney A to mail his refund checks to Attorney B, who would then travel to FCC Beaumont with the checks so that Conspirator 1 could endorse them. (SOF ¶ 29.) On June 19, 2010, Petitioner and Conspirator 1 discussed plans to then place the refunds in an off-shore account to reduce suspicion as to the origins of those funds when Conspirator 1 paid Attorney A's retainer. (SOF ¶ 30.)

On September 8, 2010, Attorney A received the refund checks totaling $2,317,078.70, and, as requested by Conspirator 1, Attorney A sent the checks by Federal Express to Attorney B in Canada. (SOF ¶¶ 31-32.) Some time thereafter, Attorney B met with Conspirator 1 at FCC Beaumont and Conspirator 1 endorsed the refund checks. (SOF ¶ 33.) Conspirator 1 directed Attorney B to disburse the refunds as follows: $550,000 to Attorney A for legal fees; $138,000 to Attorney B; $4,000 to Conspirator 1's wife; and, $10,000 to Conspirator 1. (SOF ¶ 33.) Conspirator 1 further directed Attorney B to deposit the checks in a trust account maintained in the Turks and Caicos Islands. (SOF ¶ 33.) After one year, Conspirator 1 would replace Attorney B as the sole signatory on the trust account. (SOF ¶ 33.) As directed, Attorney B left FCC Beaumont and flew to the Turks and Caicos Islands to deposit the refund checks and distribute the payments. (SOF ¶ 33.)

Several days later, on September 21, 2010, an attorney for the Bankruptcy Estate learned that the Estate's accountant and trustee no longer held a valid power of attorney to represent Conspirator 1 before the IRS. (SOF ¶ 35.) The Bankruptcy Estate attorney tracked down Attorney A and Attorney B, and Attorney B agreed to send the refund checks to the trustee of the Bankruptcy Estate. (SOF ¶ 36.) The trustee received the checks on September 23, 2010. (SOF ¶ 37.)

### B. The Indictment

On March 20, 2012, a grand jury returned an indictment against Petitioner, charging Petitioner with five offenses based on the above facts and additional allegations. (Indictment (ECF No. 3) at 3-14.) In Count One, the Indictment alleged that Petitioner conspired to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by conspiring with Conspirator 1 to secretly obtain the tax refunds that Conspirator 1 owed to the Bankruptcy Estate so that Conspirator 1 could pay for Attorney A to represent him in his criminal appeal. (Indictment ¶¶ 12-46.) Similarly, Count Two charged Petitioner with conspiring to launder money in violation of 18 U.S.C. § 1956(a)(2)(B)(i) by conspiring with Conspirator 1 to transport, transmit and transfer the tax refunds to off-shore accounts in order to conceal the illicit origins of the funds. (Indictment ¶¶ 47-48.)

In Count Three, the Indictment alleged that Petitioner unlawfully obstructed a pending proceeding — namely, Conspirator 1's criminal appeal before the United State Court of Appeals for the Fourth Circuit — in violation of 18 U.S.C. § 1505 by making false representations to the Fourth Circuit to obtain a delay in Conspirator 1's appeal until Conspirator 1 could use the tax refunds to hire Attorney A. (Indictment ¶¶ 49-51.) And, in Counts Four and Five, the Indictment charged Petitioner with violating 18 U.S.C. § 1001 by making materially false statements to an IRS criminal investigator regarding Petitioner's relationship with Conspirator 1 and his involvement in the tax refund scheme. (Indictment ¶¶ 52-54.)

### C. Petitioner's Extradition

Following the filing of the Indictment under seal, on March 20, 2012, then-United States Magistrate Judge M. Hannah Lauck issued a warrant for Petitioner's arrest. (Arrest Warrant (ECF No. 5).) The Government initially sought to extradite Petitioner from Canada but later

learned that Petitioner was traveling internationally. (Mot. to Partially Unseal Indictment & Mem. in Supp. ("Mot. to Unseal") (ECF No. 8) at 1.) The Government then moved to partially unseal the Indictment so that it could obtain a red notice against Petitioner with INTERPOL. (Mot. to Unseal at 1.) After obtaining the red notice, on February 15, 2014, the Government learned that Hungarian officials had arrested Petitioner in Budapest. (Mot. to Unseal at 1.) The Government requested to partially unseal the Indictment to obtain Petitioner's extradition to the United States. (Mot. to Unseal at 2.)

On October 23, 2015, Hungary surrendered Petitioner to the custody of the Government pursuant to Hungary's extradition treaty with the United States. (Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss the Indictment for Lack of Jurisdiction ("Def.'s MTD") (ECF No. 30) at 2.) Because the extradition treaty between the United States and Hungary (the "Extradition Treaty") provides for extradition only for felony offenses recognized under the laws of both countries, Hungary did not authorize Petitioner's extradition on Counts Four and Five of the Indictment. (Mem. of the U.S. in Opp. to Pet'r's Mot. to Vacate, Set Aside, or Correct Sentence ("Gov't Resp.") (ECF No. 97) at 2 (citing Treaty Between the Government of the United States and the Government of the Republic of Hungary on Extradition, U.S.-Hung., Art. 2, Dec. 1, 1994, S. Treaty Doc. No. 104-5 (1995) [hereinafter "Extradition Treaty"]).) The Extradition Treaty also prohibited the Government from charging Petitioner with additional offenses other than those offenses for which Hungary had allowed Petitioner's extradition, a principle of international law commonly referred to as the "Rule of Specialty." (Gov't Resp. at 3 (citing Extradition Treaty, Art. 17, Decl. 1).) Thus, the Government could prosecute only Counts One, Two and Three of the Indictment against Petitioner, or an offense based on the same facts alleged in those counts.

### D. Petitioner's Plea Agreement

After Petitioner's return to the United States, the Government negotiated a potential plea agreement with Petitioner's counsel. Initially, the Government proposed that Petitioner plead guilty to Count Three, which carried a maximum term of five years' imprisonment, but Petitioner's counsel notified the Government that Count Three charged Petitioner with the wrong offense. (Plea Hr'g Tr. (ECF No. 73) at 40:1-7.) Specifically, Count Three described conduct prohibited under 18 U.S.C. § 1503, not § 1505 as provided in the Indictment. (Plea Hr'g Tr. at 40:5-7.) Thus, Count Three charged Petitioner with a legally unviable offense, leaving only Counts One and Two of the Indictment.

The Government and Petitioner's counsel then attempted to figure out a comparable deal based on the remaining counts — Counts One and Two. (Gov't Resp. at 3.) The Government proposed that if Petitioner pled guilty to Count One, which carries a maximum sentence of twenty years, 18 U.S.C. §§ 1341, 1343, the Government would request a maximum sentence of five years pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), which provides that the Government as part of a plea agreement may "agree that a specific sentence . . . is the appropriate disposition of the case" and that "such a recommendation or request binds the court once the court accepts the plea agreement." (Gov't Resp. at 3.) Petitioner's counsel proposed that the Government issue a criminal information that cited to the appropriate statute in Count Three, but the Government rejected the proposal based on the Rule of Specialty. (Gov't Resp. at 3 (citing Plea Hr'g Tr. at 41:1-5)); *see* Extradition Treaty, Art. 17, Decl. 1 ("A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for: a. the offenses for which extradition has been granted or a differently denominated offense based on the same facts on which extradition was granted, provided such offense is extraditable, or is a

lesser included offense."). Petitioner then accepted the Government's Rule 11(c)(1)(C) offer and pled guilty to Count One on November 30, 2015. (ECF Nos. 33-36, 73.)

### E. Petitioner's Sentencing

On February 8, 2016, Judge Payne conducted Petitioner's sentencing hearing. (ECF No. 56.) During the sentencing hearing, Petitioner's counsel raised several objections to the sentence recommended in the Presentence Investigation Report ("PSR") (ECF No. 43), including objections to the sixteen-point offense level enhancement for the loss sustained, the enhancements for Petitioner's role in the charged conspiracy and an enhancement for obstruction of justice, and Petitioner's counsel also moved for a variance, in part, based on the twenty months that Petitioner spent in Hungarian prisons. (Sentencing Hr'g Tr. (ECF No. 70) at 3:19-103:12.)

After hearing arguments on Petitioner's objections and his request for a variance, Judge Payne found that the agreed-upon sixty-month maximum sentence for an otherwise twenty-year-maximum charge constituted a variance in its own right that the objections raised by Petitioner's counsel supported. (Sentencing Hr'g Tr. at 103:13-104:7.) Judge Payne concluded that "the record [did] not support a variance . . . below 60 months . . . to arrive at a sentence that is sufficient but not greater than necessary to achieve the sentencing objectives set by the statute." (Sentencing Hr'g Tr. at 104:8-12.) Accordingly, after allowing Petitioner to speak, Judge Payne imposed a sentence of sixty months' imprisonment with three years of supervised release to follow. (Sentencing Hr'g Tr. at 109:2-25.)

### F. Petitioner's 2255 Motion

On September 11, 2017, Petitioner, through counsel, filed his § 2255 Motion (ECF No. 93). In support of his Motion, Petitioner argues that his counsel provided ineffective assistance

when he abandoned the Government's initial offer to accept a guilty plea on Count Three of the Indictment. (Mem. of L. & Facts in Supp. of Mot. to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 ("Pet.'s Mem.") (ECF No. 94) at 8-11.) Specifically, Petitioner contends that his counsel erroneously concluded that Count Three could not be charged because of the mistaken citation to 18 U.S.C. § 1505 instead of § 1503. (Pet.'s Mem. at 8-9.) Petitioner cites to the Fourth Circuit's holding in *Sonnier v. United States*, 314 F.2d 69, 70 (4th Cir. 1963), for the proposition that mistaken citations in an Indictment do not affect the validity of a charge unless the mistake misleads the defendant. (Pet.'s Mem. at 8-9.) Petitioner contends that because the language of Count Three "tracked a violation of § 1503," the mistaken citation to § 1505 did not mislead him, permitting a plea on Count Three. (Pet.'s Mem. at 9.) Petitioner argues that his Sentencing Guidelines range would have been lower if he had pled guilty to Count Three instead of Count One, which demonstrates a reasonable probability that he would have pleaded differently if his counsel had properly advised him. (Pet.'s Mem. at 10-11.)

The Government responded to Petitioner's Motion on November 12, 2017, (Gov't Resp.), and, on November 30, 2017, Petitioner filed his Reply, (Reply to Gov't's Resp. to § 2255 Mot. ("Pet. Reply") (ECF No. 98)), rendering Petitioner's § 2255 Motion now ripe for review.

## II.   STANDARD OF REVIEW

To demonstrate ineffective assistance of counsel, a convicted defendant must first show that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting

*Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court has modified this second prong of *Strickland* to require the convicted defendant to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Of course, in conducting the foregoing inquiry, the representations of the convicted defendant, his lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977).

### III. ANALYSIS

Based on these principles, the Court finds that Petitioner's counsel did not perform deficiently. For one, although Petitioner argues that the Government would have otherwise executed the plea agreement based on Count Three had his counsel not pointed out the legal error, (Pet.'s Reply at 2), Petitioner's counsel in fact had a duty of candor to the Court that prevented the execution of a legally unviable plea agreement, *see United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993) (recognizing that attorneys have a general duty of candor to the court, which includes a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation" (internal quotations and citations omitted)).

And Judge Payne himself noted that he likely would have discovered the legal error in the Indictment had Petitioner's counsel not pointed it out. (Sentencing Hr'g Tr. at 39:1-7.) The Court will not sustain a § 2255 challenge based on an argument that Petitioner's counsel should have hidden what he had a duty to reveal. *See HUD v. Cost Control Mktg. & Sales Mgmt.*, 64 F.3d 920, 925 (4th Cir. 1995) (admonishing "that a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy").

More importantly, once Petitioner's counsel revealed the citation error in Count Three, the Government, not Petitioner's counsel, made the determination that it could not recharge Petitioner with a properly cited version of that count, despite Petitioner's counsel's request that the Government do just that. (Ex. 1 to Pet.'s Mem. ("Email Exchange") (ECF No. 94-1).) Therefore, even assuming the Government could have amended Count Three without resubmission to a grand jury or that Petitioner would have waived his right to an indictment and pled guilty to a criminal information, the Government, not Petitioner's counsel, precluded that course of action by exercising its prosecutorial discretion in light of its interpretation of domestic and international law. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (holding that "the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [a prosecutor's] discretion"). And the Court was not in a position to question that decision. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) (warning against judicial review of prosecutorial decisions, because "such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake"). In other words, Petitioner's counsel could not provide ineffective assistance for a decision that fell outside of his, and the Court's, control.

The question then becomes whether, considering the Government's refusal to recharge an amended version of Count Three, Petitioner's counsel provided adequate representation based on the remaining counts: Counts One and Two. To that end, Petitioner does not argue that, given the available counts, his counsel erroneously advised him to plea to Count One with a Rule 11(c)(1)(C) cap on the statutory maximum at five years. Indeed, considering that if Count Three had been properly charged, Petitioner would be exposed to up to ten years' imprisonment, the five-year cap negotiated by his counsel provided a much lower risk exposure overall, especially because Counts One and Two both carried maximum penalties of twenty years' imprisonment. 18 U.S.C. §§ 1341, 1343, 1349, 1503, 1956(a)(2)(B)(i), 1956(h). Therefore, if anything, Petitioner's counsel successively leveraged the mistaken citation in Count Three to obtain the best result for his client.

For these reasons, the Court finds that Petitioner's counsel did not provide deficient representation. Moreover, even if Petitioner's counsel had provided deficient representation, Petitioner cannot point to any prejudice from that representation, because he fails to demonstrate a reasonable probability that Judge Payne would have allowed him to enter a guilty plea on Count Three had his counsel remained silent. Simply put, Count Three was off the table, and Petitioner cannot vacate his sentence based on a legally infeasible alternative outcome. Accordingly, the Court will deny Petitioner's § 2255 Motion.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES Petitioner's 2255 Motion (ECF No. 93). An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

                                                  /s/
                                         David J. Novak
                                         United States District Judge

Richmond, Virginia
Date: March 6, 2020